**GATEWAY CENTER CORPORATION, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 84–1634.**

United States Court of Appeals, Federal Circuit.

June 17, 1985.

Robert D. Wallick, Steptoe & Johnson, Washington, D.C., argued for appellant.

William J. Snider, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Sandra P. Spooner.

Before FRIEDMAN, KASHIWA and SMITH, Circuit Judges.

FRIEDMAN, Circuit Judge.

This appeal challenges two rulings of the General Services Administration Board of Contract Appeals (Board) interpreting a tax escalation clause in a building lease. The Board held (1) that a provision for rent increases at 5-year intervals to reflect increases in real estate taxes operated only prospectively for the next 5-year period and did not entitle the lessor to recover all the additional taxes it paid during the preceding 5 years, and (2) that the base for determining the initial tax rate with which the subsequent increased taxes are to be compared is the tax paid during the 12-month period of the lease year (from November to November) rather than, as the appellant contended, the first calendar year for which taxes were assessed. We affirm both rulings.

I

In November 1972, the appellant, Gateway Center Corporation (Gateway), leased to the United States more than 98 percent of the space in a large office building it owned in Philadelphia. The building had not been completed when the lease was executed. The lease was for 20 years beginning on November 13, 1972, and permitted two 5-year renewals at the government's option. The annual rental, payable monthly, was $2,313,283.35, which would be increased to $2,575,742.35 if the government exercised its renewal option.

The government began its occupancy of the building in November 1972. It did not fully occupy the space it had leased until 1973, when the building was completed.

The lease contained a tax escalation clause providing in pertinent part as follows:

At the end of the first five (5) years, first ten (10) years, first fifteen (15) years, first twenty (20) years and at the end of the first twenty-five (25) years, if the Government exercises the renewal option, of Government occupancy under the lease the annual rental rate will be adjusted to provide for increases or decreases in general real estate taxes. The tax adjustment amount shall be 100% of the increase or decrease of the total taxes to be paid on facility entirely occupied by the Government, and the total rental, including any such adjustment, shall not exceed the limitation imposed by Section 322 of the Economy Act of June 30, 1932, as amended (40 U.S.C. 278a). The base from which adjustments will be made will be calculated from the assessment, assessment ratio and tax rate in effect during the fifth, tenth, and fifteenth,

twentieth, and twenty-fifth year respectively, of occupancy, as compared to the first full assessment, assessment ratio and tax rate in effect during the first year of the lease. ... In the event the first, fifth, tenth, fifteenth, twentieth, or twenty-fifth year of occupancy does not coincide with a tax year, the base will be established by pro-rating the tax period involved.

Proof of the amount of tax and evidence of payment will be furnished by the Lessor and the rental adjustment by reason of tax increases or decreases shall be accomplished by increasing or decreasing the next monthly rental check in the appropriate amount.

... The Government may contest the amount or validity of any valuation for general real estate taxes by appropriate legal proceedings either in the name of the Government or the name of the Lessor or in the names of both. In the event that the Government is precluded from such proceeding, the Lessor, upon reasonable notice and request by the Government, shall contest any such proceeding and in the event of any such request, the Government shall reimburse the Lessor for its costs or expenses · in connection with any such contest or proceeding.... If the Lessor receives any refund of taxes, the Lessor shall promptly rebate to the Government the Governments' [sic] proportionate share thereof. The reimbursement to the Lessor including payment for real estate tax increases must not exceed the amount authorized by Section 322 of the Economy Act of June 30, 1932, as amended, (40 U.S.C. 278a).

Real estate taxes were assessed and paid on a calendar year basis. The first year in which the building was fully assessed for taxes was 1974. In that year Gateway paid $310,193. The taxes increased to $330,988 for 1975 and 1976, and to $428,031 for 1977.

During negotiations between Gateway and the United States for the rent for the second 5-year period of the lease—November 13, 1977 to November 12, 1982—a dispute arose over the proper basis for determining under the tax escalation clause the additional rent to reflect the tax increase. There were two issues in controversy:

1. The government contended that the rental was to be increased to reflect the higher real estate taxes only prospectively. Under the government's interpretation of the lease, the higher tax rate in effect in the 5th year would be carried over into higher rent during the 6th through the 10th year. Gateway contended that it was also entitled to an additional amount to reflect the total increased taxes it had paid during the preceding 5 years.

2. The government contended that "the first full assessment, assessment ratio and tax rate in effect during the first full year of the lease" was the tax paid in the 12-month period from November 13, 1974 to November 12, 1975. Under the government's view an apportionment was required of the taxes Gateway paid in 1974 and 1975. Gateway contended that the base for making the calculation was the taxes paid in the calendar year 1974.

When the government insisted upon its interpretation of the tax escalation clause, Gateway sought review before the Board. The government has not questioned the Board's authority under the Contract Disputes Act of 1978, 41 U.S.C. § 601 et seq. (1982), to decide the questions involving the interpretation of the escalation clause of the lease.

The Board *in banc* upheld the government's construction of the clause. Five members joined in an opinion that rested on an interpretation of the language of the clause. Three of those five also joined in a concurring opinion which concluded that the provisions were so patently ambiguous that Gateway should have inquired of the government about their meaning. One member agreed with the majority that the rent escalation clause applied only prospectively but would have used the calendar year 1974 as the basis from which to determine the tax increase. Two members were of the view that Gateway was entitled to

receive as additional rent all of the increased taxes it paid during the preceding 5 years.

## II

Although the tax escalation clause is hardly a model of clarity, we agree with the Board that the government's interpretation of the provisions is correct.

A. 1. The clause provides that at the end of each 5-year period of the lease "the annual rental rate will be adjusted to provide for increases or decreases in general real estate taxes." The amount of the adjustment is to be determined by comparing the "assessment, assessment ratio and tax rate" in effect in the 5th, 10th, etc. "year ... of occupancy" with those items "in effect during the first year of the lease." The clause then provides that "the rental adjustment by reason of tax increases or decreases shall be accomplished by increasing or decreasing the next monthly rental check in the appropriate amount."

■ Several aspects of these provisions show that they were intended to apply only prospectively and not retroactively.

a. The clause requires adjustment every 5 years "in the annual rental rate" "to provide for increases or decreases" in real estate taxes as compared to those taxes in effect during the first year of the lease. It further provides that those adjustments "shall be accomplished by increasing or decreasing the next monthly rent check in the appropriate amount." In other words, the amount of the increase (or decrease) is to be determined every 5th year, and such increase is to be reflected in an increase in the next (and subsequent) monthly rental check.

On their face, these provisions provide that when real estate taxes have been increased during the prior 5 years, the monthly rental payment for the remainder of the lease will be increased to reflect the differential between the tax in the first year of the lease and the higher tax in the 5th year. If the clause were designed to enable Gateway to recover the total increased taxes it paid during the preceding 5 years, it certainly would not have provided that "the rental adjustment by reason of" the tax increase "shall be accomplished" by increasing the next monthly rental check.

b. Although the term of the lease is 25 years, there is no adjustment for increases in real estate taxes at the end of the 25th year (unless the government exercises its renewal option, which would extend the lease). The last rent adjustment is to be made in the 20th year of the lease. If the lease contemplated a retroactive adjustment to reflect the total increased taxes paid during each preceding 5-year period, surely it would have provided some mechanism to cover tax increases during the final 5 years of the lease. The absence of any provision to accomplish that result is strong and convincing evidence that the lease does not provide for the retroactive adjustment that Gateway seeks.

c. If the lease contemplated that Gateway would be reimbursed for every increase in real estate taxes it paid during the entire term of the lease, many of the detailed provisions governing the method and basis upon which the amount of the increased taxes would be calculated and the payment of those increases would be made would have been unnecessary.

2. Gateway's claim for retroactive entitlement of all its tax increases rests almost entirely on the provision in the tax escalation clause that "[t]he tax adjustment amount shall be 100% of the increase or decrease of the total taxes to be paid on facility entirely occupied by the Government." Gateway states, but without citations to the record, that two of its witnesses "testified that it was Gateway's intention during negotiations to obtain 100% reimbursement of all taxes paid and that Gateway had interpreted the clause in question as satisfying that desire. This testimony was uncontradicted."

The question, however, is not what Gateway's intention was during the negotiations or how it unilaterally interpreted the language. The question is what the parties intended. Gateway states that the tax es-

calation clause "was not addressed by the parties during negotiations."

The clause does not say, as Gateway interprets it, that Gateway is entitled "to obtain 100% reimbursement of all taxes paid." It provides only that the tax adjustment amount "shall be 100% of the increase ... of the total taxes to be paid...." The future verb "to be paid" is prospective in operation, not retroactive. The words "total taxes to be paid" do not provide, as Gateway assumes, that Gateway is entitled to recover all the taxes it paid during the preceding 5 years. Rather, it indicates that the additional rent is to cover increases in all types of real estate taxes that Gateway may be required to pay in the future.

Read in conjunction with and in light of the other provisions of the clause, including the requirement that the rent adjustment to reflect tax increases is to be accomplished by increasing the next monthly rental check, we think this clause was merely intended to make clear that the rental adjustment was to cover only the portion of the tax increases allocable to the part of the building the government occupied. Here the government occupied 98.71 percent of the building. Without this provision it could be contended that the rental increase should cover 100 percent of the tax increase.

■ 3. Gateway also points to the last sentence of the clause, which sets a limit on the "reimbursement to the Lessor including payment for real estate tax increases." This provision, which almost immediately follows the provision requiring the government to reimburse Gateway for the latter's expenses in contesting real estate taxes, cannot properly be read as indicating that Gateway is entitled to retroactive payment of all real estate taxes incurred during the prior 5 years. If the tax escalation clause was intended to have that sweeping effect, we think that the contract either would specifically so have provided or at least would have taken a different form than it took. It certainly would not have attempted to do so by defining "reimburse-

ment" to include "payment for real estate tax increases" in a provision setting a ceiling on reimbursement.

As noted, we cannot discern in the other provisions of the clause, which detail the basis and method for determining the increases in rent to reflect real estate tax increases and the scope of those increases, any requirement of retroactive payment of total real estate taxes. The mere use of the term "reimbursement" is not sufficient to overcome that conclusion. We think the word "reimbursement" was intended only to make clear that in insuring that the total payments to Gateway did not exceed those permitted by section 322 of the Economy Act, the higher taxes Gateway paid in any particular year for which it was reimbursed later in that year through higher rentals were to be included.

4. Gateway argues that the rent escalation clause is ambiguous and that because its interpretation of the clause is reasonable, the clause should be construed against the government, which drafted it. The government counters that the clause is clear and unambiguous, but that if it is ambiguous, the ambiguity was patent, which obligated Gateway to make inquiry of the government before signing.

■ We do not think that the correct interpretation of these complex contractual provisions should turn upon such talismanic slogans. Our task is to interpret the language of the contract. We conclude that, fairly read in context and in their entirety, the provisions of the rent escalation clause do not entitle Gateway to recover all the increased taxes it paid during a prior 5-year period.

■ B. The determination of the amount of increased real estate taxes to be reflected in higher rent requires a comparison between the tax rate in effect during the 5th, 10th, etc., "year ... of occupancy" and the "first full assessment, assessment ratio and tax rate in effect during the first year of the lease." If the 1st, 5th, 10th, etc., "year of occupancy does not coincide with a tax year, the base will be estab-

lished by pro-rating the tax period involved."

Gateway contends that under these provisions the "first year of the lease" in which there was the "first full" assessment and tax was the calendar year 1974. It points out that 1974 was the first year for which taxes were fully assessed and also was a year in which the government fully occupied the leased space. The government contends, and the Board held, that the applicable base is the first full lease year in which taxes were fully assessed, namely, November 13, 1974 to November 12, 1975. The Board determined the tax base for that lease year by prorating the different taxes Gateway paid in 1974 and 1975, in accordance with the proration provision.

We agree with the Board.

The language of the clause supports the Board's interpretation. The operative language is "the first full assessment, assessment ratio and tax rate in effect during the first year of the lease." Read in context and in the light of the other provisions of the clause, we think this means "the first year of the lease" in which taxes were fully assessed.

The first year in which taxes were fully assessed was 1974. The lease year, however, was from November 13 to November 12. The first "year of the lease" that met the requirement of full tax assessment was the year beginning November 13, 1974 and ending on November 12, 1975.

This construction of the clause accords with and effectuates the provision that if the "first . . . year of occupancy does not coincide with a tax year, the base will be established by pro-rating the tax period involved." The parties recognized and provided for the possible situation that occurred in this case—that the year of the lease would be different from the tax year, which here was the calendar year. Gateway has given no convincing reason why we should not give effect to the parties' recognition that, if these 2 years were different, the taxes paid in the tax year would be prorated and reflect the lease year.

Our interpretation of the base year also is consistent with the purpose of the rent escalation clause. In setting the rent, Gateway necessarily made various assumptions and conclusions regarding the real estate taxes that it would pay during the first lease year, since this was a significant expense in determining the rent. The clause was designed to enable Gateway to pass on to the government, at 5-year intervals, the increased real estate taxes that were in effect in the 5th year. Since the additional rent was designed to reflect those increased taxes, the base for determining the additional taxes properly parallels the base upon which the rent was fixed and paid, namely, a year running from November 13 to November 12.

### CONCLUSION

The decision of the General Services Administration Board of Contract Appeals is affirmed.

AFFIRMED.